**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**RENEE K. TRIMBUR, et al.,**

      **Plaintiffs,**

      **v.**

**NORFOLK SOUTHERN RAILWAY**
**COMPANY, et. al.,**

      **Defendants.**

**Case No. 2:13-cv-0160**
**CHIEF JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Norah McCann King**

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion to Strike (ECF No. 117), and Defendants' Motions for Summary Judgment (ECF Nos. 90, 106). For the reasons set forth below, the Court **DENIES** as moot Defendants' Motion to Strike, **GRANTS** Defendants' Motion for Partial Summary Judgment (ECF No. 106) and **GRANTS in PART** and **DENIES in PART** Defendants' Motion for Summary Judgment (ECF No. 90).

## I. BACKGROUND

On July 11, 2012, a train traveling eastbound on tracks owned and operated by Defendant Norfolk Southern Railway Company[1] derailed at approximately 2 a.m. just south of the Ohio State Fairgrounds in Columbus, Ohio. (Talley Aff. ¶ 4; ECF No. 90-1, Ex. 1; ECF No. 90-2.) The train, 186L809, consisted of two locomotives carrying 97 loaded cars (in addition to one empty), 49 of which contained hazardous materials.

---

[1] Norfolk Southern Railway Company is an operating subsidiary of Defendant Norfolk Southern Corporation ("NSC") (collectively, "Defendants" or "NSRC"). Defendants maintain that there is no basis or reason for NSC to be a party to the case. No motion has been made to separately dismiss NSC from the action.

Three of the cars, NATX 364083, NATX 364118, and NATX 364017 were DOT-111A100W1 ("DOT-111") tank cars[2] containing denatured ethanol.[3] (Schoendorfer Aff. ¶ 3; ECF No. 106-1.) A third-party company named American Railcar Industries ("ARI") manufactured the tank cars in 2007 on behalf of General Electric Capital Railcar ("GE"), for the transport of flammable liquids. (*Id.* ¶ 4.) In 2007, ARI certified that the design and construction of NATX 364083, NATX 364118, and NATX 364017 conformed to all applicable Department of Transportation ("DOT") and Association of American Railroads ("AAR")[4] requirements, as reflected in a 2007 ARI Application for Approval and Certificate of Construction. (*Id.* ¶ 5.) The Association of American Railroads North American Tank Car Committee subsequently approved ARI's Application for Approval and Certificate of Construction for these cars in June 2007. (*Id.* ¶ 6.) On July 3-4, 2012, a third party inspected, loaded, and offered the DOT-111 tank cars into service in Cedar Rapids, Iowa. (*Id.* ¶ 7.) The consignee certified that the tank car materials were in proper condition for transportation according to the applicable DOT regulations. (*Id.*) NSRC then accepted the cars in interchange from another railroad in Chicago, Illinois, on or about July 10, 2012. (*Id.* ¶ 8.)

Seventeen loaded cars derailed at the time of the incident, including two cars carrying corn syrup, three cars carrying ethanol, and 12 cars carrying various types of grain (specifically, malt, oats and wheat). (*Id.*) At the time of the derailment, NATX 364083 was punctured by a coupler.[5] The puncture caused ethanol to release and the car caught fire. The release of ethanol onto the ground caused a pool fire within the immediate area where NATX 364118 and NATX

---

[2] DOT-111 tank cars are DOT specification 111 series non-pressure tank cars designed to carry a variety of products, including certain hazardous materials. 49 C.F.R. §§ 179.200-179.201 (Specifications for Non-Pressure Tank Car Tanks); 49 C.F.R. §§ 179.10-179.24 (General Design Requirements).

[3] Denatured ethanol is ethanol to which benzene, toluene, ethylene, and xylene have been added. (Eckels Dep., pp. 145-47; ECF No. 85, Martin Dep., p. 45; ECF No. 79.)

[4] The DOT's Pipeline and Hazardous Materials Safety Administration issues federal tank car regulations, while the AAR Tank Car Committee sets industry standards.

[5] A coupler is a mechanism for connecting rolling stock in a train.

364017 were derailed.  The pool fire, in turn, caused both cars to suffer heat induced tears.  (*Id.*)

Grain and corn syrup were also released or spilled as a result of the derailment.  (Connelly Dep.,

pp. 122, 191-92; ECF No. 81.)

As a result of the derailment-induced ethanol fire, the Columbus fire department

evacuated approximately 100 people from 30 homes and various businesses in the immediate

area.  (*Id.*)  The evacuation lasted from shortly after the derailment to the morning of July 13,

2012.  (Pickard Aff. ¶¶ 11-12; ECF No. 90-6.)  The Columbus fire department worked with

NSRC management and the Federal Rail Administration ("FRA") on the initial response and

derailment cleanup.  (Talley Aff. Ex. 1.)  Several hours after the derailment, the National Train

Safety Board ("NTSB") informed NSRC that it would be sending a full investigatory team to the

area.  (*Id.*)

Plaintiffs in this case are Renee K. Trimbur ("Trimbur"), The Kyron Tool & Machine

Co., Inc., ("Kyron Tool") and C4R's, LLC ("C4R") (collectively, "Plaintiffs").  Plaintiffs own

the following properties near the site of the derailment:

Kyron Tool

- 487 Bonham Ave., Columbus, Ohio
- 494 and 510 Dow Ave., Columbus, Ohio

C4R

- 501 Dow Ave., Columbus, Ohio
- .126 acres of land on Bonham Ave., leased to Interior Supply
- .497 acres of land on Dow and Daugherty Ave., Columbus, Ohio

(Haueisen Dep., pp. 9, 16-19, 37; ECF No. 83, Trimbur Dep., pp. 186, 188; ECF No. 75.)  Kyron

Tool primarily manufactures component parts for industrial scales of all sizes.  (Haueisen Dep.,

p. 15.)  At one time, Kyron Tool used the above-reference buildings for machine tool operations.

(*Id.*, p. 22, 24.)   Prior to the derailment, Kyron Tool moved the majority of its business

operations to a new facility and, on an intermittent basis, sent employees to the buildings located near the derailment. (*Id.*)  C4R is a holding company that owns the real estate referenced above. (*Id.*, p. 19.)  Trimbur is an officer of both Kyron Tool and C4R. (Trimbur Dep., pp. 186, 188.)

The derailment occurred as a result of a broken outside rail. (Wolf Rep. ¶ 4; ECF No. 90-5.)  NSRC does not dispute that grain may have ended up on Plaintiffs' property. (Connelly Dep., p. 22; Martin Dep., pp. 63-64.)  NSRC does, however, dispute that ethanol was released onto Plaintiffs' property. (NSRC Br., p. 7; ECF No. 90.)  NSRC states that approximately 37,000 gallons of ethanol were recovered from the tank cars during the cleanup process. (*Id.*)  Plaintiffs estimate that approximately 53,000 gallons of the total 90,000 gallons of ethanol stored in the three railcars spilled. (Eckels Dep., pp. 193-195.)  Plaintiffs further assert that, as a result of the derailment, chemicals released onto their properties have rendered them unsafe for commercial use. (Trimbur Dep., pp. 191-92; Gossman Dep., pp. 31, 87-88, 216; ECF No. 87; Gossman Rep., pp. 7-8; ECF No. 107-13; Eckels Rep., pp. 5, 14; ECF No. 107-11.)

Plaintiffs initiated this action by filing a Complaint on February 25, 2013 (ECF No. 2) (the "Complaint" or "Compl."), alleging the following: negligence, gross negligence, negligence per se, common law strict liability, and nuisance. (Compl., pp. 6-15.)  Plaintiffs seek compensatory damages, punitive damages and attorney's fees. (*Id.*, pp. 16-20.)

NSRC filed a Motion for Partial Summary Judgment on August 4, 2014 (ECF No. 48), arguing for federal preemption of Plaintiffs' claims pertaining to the DOT-111 tanker cars.  On November 25, 2014, the Court denied NSRC's motion without prejudice to re-filing (ECF No. 94), pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, because Plaintiffs asserted they were unable to present facts essential to their opposition.  On November 21, 2014, NSRC filed a second summary judgment motion (ECF No. 90) as permitted by this Court (ECF No. 71).

The second motion moved for judgment as to all claims.  On December 30, 2014, Defendants re-filed their motion for partial summary judgment pertaining to the DOT-111 tanker claims (ECF No. 106).  On February 17, 2015, Defendants filed a Motion to Strike certain exhibits to and statements of fact contained within Plaintiffs' Response to Defendants' Motion for Summary Judgment (ECF No. 117).  All three motions are addressed below.

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993).  To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence).  Furthermore, the existence of a

mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

### III. MOTION TO STRIKE

NSRC moves to strike certain exhibits attached to and statements of fact contained within Plaintiffs' Response to NSRC's Motion for Summary Judgment (ECF No. 117). Specifically, NSRC argues that Plaintiffs submit inadmissible evidence consisting of improper hearsay, opinion evidence, and unauthenticated or uncertified documents.

The Court has examined only the well-founded evidence and determined that its ruling for summary judgment does not hinge upon any of the contested exhibits or statements of fact. Therefore, the motion to strike is **DENIED** as moot.

### IV. FEDERAL PREEMPTION OF CLAIMS

#### A. Standard

##### 1. Supremacy Clause

Under the Supremacy Clause of the United States Constitution, "[w]here a state statute conflicts with, or frustrates, federal law, the former must give way." *CSX Transportation Inc. v. Easterwood*, 507 U.S. 658, 663 (1993); *citing* U.S. Const., Art. VI, cl. 2; *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). "However, there is a presumption against the supplanting of historic state powers by the federal government unless preemption is 'the clear and manifest purpose of Congress.'" *Tyrrell v. Norfolk Southern Ry. Co.*, 248 F.3d 517, 522 (6th Cir. 2001); *citing Easterwood*, 507 U.S. at 663-64; *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992). In

this case, the federal statutes at issue contain express preemption clauses, therefore, "the task of statutory construction must in the first instance focus on the plain wording of the clauses, which necessarily contain the best evidence of Congress's pre-emptive intent." *Tyrrell*, 248 F.3d at 522; *quoting Easterwood*, 507 U.S. at 664. The Sixth Circuit has further explained:

> Although the analysis of a preemption clause's scope begins with its text, "our interpretation of that language does not occur in a contextual vacuum." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 484–85, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). The "ultimate touchstone" of preemptive effect is Congress's purpose. *See id.* at 485, 116 S.Ct. 2240. In order to develop "'a fair understanding of congressional purpose,'" a reviewing court must study the preemption language, the surrounding statutory structure and regulatory scheme, and how Congress intended "to affect business, consumers, and the law" through these combined factors. *Id.* at 485–86, 116 S.Ct. 2240 (citing *Cipollone,* 505 U.S. at 530 n.27, 112 S.Ct. 2608 (opinion of Stevens, J.)).

*Tyrrell*, 248 at 522.

"Congress has vested aspects of national rail oversight in three different federal agencies: U.S. DOT [Department of Transportation] (with primary jurisdiction over rail safety matters), DHS [Department of Homeland Security] (for national security matters), and the [Surface Transportation] Board (with broad general jurisdiction over railroad activities conducted over the interstate railroad network)." *C.S.X. Transportation, Inc.—Petition for Declaratory Order*, Fed. Carr. Cas. P 37186 (S.T.B.), STB Finance Docket No. 34662, 2005 WL 584026, at \*8 (Mar. 14, 2005). Each of the three agencies has promulgated regulations pursuant to its jurisdiction, which "necessarily overlap to some degree." *Id.*

### 2. Federal Rail Safety Act

The Federal Rail Safety Act ("FRSA") was enacted in 1970 in order "to promote safety in all areas of railroad operations and to reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. In furtherance of these goals, the FRSA specifically empowers the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety

7

supplementing laws and regulations in effect on October 16, 1970." 49 U.S.C. § 20103(a).

Toward the goal of promoting national uniformity in railroad regulations, an express preemption

provision is included:

> Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order-
>
> (1) is necessary to eliminate or reduce an essentially local safety hazard;
>
> (2) is not incompatible with a law, regulation, or order of the United States Government; and
>
> (3) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106. "The FRSA therefore permits state regulation related to railroad safety only

if: (1) the Secretary of Transportation has not yet regulated the subject matter of the state

regulation (the first savings clause), or (2) the regulation (a) is necessary to eliminate an

essentially local hazard, (b) does not conflict with federal law, and (c) does not unreasonably

burden interstate commerce (the second savings clause)." *CSX Transportation, Inc. v. City of*

*Plymouth*, 283 F.3d 812, 815 (6th Cir. 2002).

While the "presumption against federal preemption is embodied in the saving clauses of

49 U.S.C. § 2106," it "is not irrebuttable." *Id*. at 816. "To prevail on a claim that federal

regulations are preemptive, a party must establish more than that they touch upon or relate to the

state regulation's subject matter." *Tyrrell*, 248 F.3d at 524; *quoting Easterwood*, 507 U.S. at

664. "Instead, preemption will lie only if the federal regulations *substantially subsume* the

subject matter of the relevant state law." *Id* (emphasis in original). The Sixth Circuit has

enumerated that "[p]reclusion and preemption under the FRSA are not limited to situations

where the federal or state standard is incompatible with a regulation." *Nickels v. Grand Trunk Western R.R., Inc.*, 560 F.3d 426, 432 (6th Cir. 2009). In other words, incompatibility with a federal law is sufficient but not necessary for preemption of a state law.

### 3. Hazardous Materials Transportation Act & Hazardous Materials Regulations

The Hazardous Materials Transportation Act ("HMTA"), 49 U.S.C. § 5101, *et. seq.* (formerly 49 U.S.C. § 1801, *et. seq*.), enacted by Congress in 1975, governs hazardous material storage, handling and transportation. The HMTA authorizes the Secretary of Transportation to "prescribe regulations for the safe transportation, including security, of hazardous materials in intrastate, interstate and foreign commerce." 49 U.S.C. § 5103(b)(1); *see also Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 812 (D.C. Cir. 2006) (this delegation of power is a "broad mandate"). Notably, the FRSA preemption analysis applies to the HMTA. *CSX Transp., Inc. v. Pub. Util. Com'n of Ohio*, 901 F.2d 497, 501 (6th Cir. 1990). Pursuant to the HMTA, the DOT promulgated the Hazardous Materials Regulations ("HMR"), 49 C.F.R. §§ 171-180.605. The HMR apply to matters of "transportation" in commerce, including, as in this case, rail carriers transporting denatured ethanol. 49 U.S.C. § 5103(b)(1). Specifically, tank cars used to transport denatured ethanol must comply with the HMR. 49 C.F.R. § 173.31(a)(1); 49 C.F.R. § 173.31 (a)(2).

### 4. Interstate Commerce Commission Termination Act ("ICCTA")

Congress has long regulated railroad activities under its Commerce Clause powers via the Interstate Commerce Act ("ICA"). *See* 49 U.S.C. 701-727, 10101-11908*; Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981) ("The Interstate Commerce Act is among the most pervasive and comprehensive of federal regulatory schemes and has consequently presented recurring pre-emption questions from the time of its enactment."). In

1995, the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10101, *et. seq.*), superseded the ICA in order "to operate transportation facilities and equipment without detriment to the public health and safety."  49 U.S.C. § 10101(8).  To that end, the ICCTA established the Surface Transportation Board ("STB"), which retains "exclusive" authority "over transportation by rail carriers" over any track that is part of the interstate rail network.  49 U.S.C. § 10501(b).  The express preemption clause in the ICCTA reads:

> The jurisdiction of the [Surface Transportation] Board over--
>
> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C.A. § 10501(b).

### B. DOT-111 Tanker Claims

Plaintiffs claim that NSRC negligently failed to reject for inclusion within its train cars the DOT-111 tanker cars, which were "known to be unsafe." (Compl. ¶ 18.)  NSRC responds that all claims related to the acceptance and condition (i.e. design, manufacture, maintenance and handling) of the DOT-111 tanker cars are preempted by federal law.

Under the HMR, every tank car used for transportation of a hazardous material must be equipped with a coupler vertical restraint system.  49 C.F.R. § 179.14.  The coupler vertical restraint system must meet one of two qualifications, either: (1) it must be included in the list of

approved couplers provided in 49 C.F.R. § 179.14(d); or (2) it must be tested to ensure compliance with the requirements of 49 C.F.R. § 179.14. *Id.* It is undisputed that the DOT-111 tank cars at issue were not equipped with couplers from the approved list provided in the HMR and that NSRC was unable to obtain documentation of the alternatively-required test verification. (NTSB report, p. 58; ECF No. 115-5.)

NSRC contends that it was nevertheless obligated to accept and transport the DOT-111 tanker cars under common-carrier federal law, prescribing that a "rail carrier providing transportation or service subject to the jurisdiction of the [STB] shall provide the transportation or service on reasonable request." 49 U.S.C. § 11101(a). Courts have agreed that this provision includes the required transport of hazardous materials. *Akron, Canton & Youngstown R.R. Co. v. I.C.C.*, 611 F.2d 1162, 1168-69 (6th Cir. 1979) (rail carriers could not refuse to transport nuclear materials); *Riffin v. Surface Transp. Bd.*, 733 F.3d 340, 346 (D.C. Cir. 2013) ("common carrier obligation requires a railroad to transport hazardous materials where the appropriate agencies have promulgated comprehensive safety regulations"). In *Riffin*, the court upheld the STB's rejection of a new carrier's application to operate while refusing to transport hazardous materials on 800 feet of privately-owned track. 733 F.3d at 346-47. Specifically, the court found that "[w]here an agency has promulgated comprehensive safety regulations for a particular type of cargo (helping to ensure the safety of shipments of that category of freight), those regulations can be viewed as transforming a shipping request into a presumptively reasonable one under § 11101." *Id.*

Plaintiffs argue that the request to transport the DOT-111 tanker cars was not reasonable due to the cars' noncompliance with the HMR's coupler regulation. If a request to transport

hazardous materials does not comply with applicable safety regulations, Plaintiffs assert, it may not be presumed reasonable. The Court disagrees.

The STB — the entity charged with overseeing the "reasonable request" regulation — has observed that "[w]hat constitutes a reasonable request for service is not statutorily defined but depends on all the relevant facts and circumstances." *Id*. at 346; *quoting Eric Strohmeyer and James Riffin—Acquisition and Operation Application*, Docket No. FD 35527, 2011 WL 5006471, at *3-4 (Oct. 18, 2011). As the briefing from both parties and this Opinion and Order demonstrates, there are myriad safety regulations applicable to the transportation of hazardous material. A request to transport may still be reasonable despite the fact that something in the design, manufacture, or handling of the hazardous material has run afoul of a safety regulation somewhere along the way. Here, NSRC did not design, own or manufacture the tank cars. (Schoendorfer Aff. ¶ 4.) The manufacturer, ARI, certified that the design and construction of the tank cars conformed to all applicable safety standards and regulations before and after their construction. (*Id*. ¶¶ 4-6.) A third party originally inspected and loaded the tank cars into service, certifying that the tank cars complied with applicable DOT regulations. (*Id*. ¶ 7, attachment.) Finally, NSRC accepted the tank cars in interchange from another railroad. (*Id*. ¶ 8.) Under these circumstances, NSRC complied with a reasonable request to transport the DOT-111 cars filled with ethanol.

Plaintiffs' reliance on *Riffin* in arguing to the contrary is misplaced. The *Riffin* court stated that the **existence** of comprehensive safety regulations transforms a shipping request into a presumptively reasonable one, rather than **compliance** with said regulations. *Riffin*, 733 F.3d at 346-47. While the latter may be true — a request to transport materials in compliance with applicable comprehensive safety regulations is presumptively reasonable – that was not the

court's holding and the holding does not imply that noncompliance makes the transport request presumptively unreasonable.  Instead, as the STB has indicated, the reasonableness of a request depends on the relevant factual circumstances.

NSRC additionally argues that the DOT-111 tanker claims are preempted by the HMTA and the FRSA.  Multiple federal courts have found state law claims preempted under similar circumstances.  In *In re Derailment Cases*, the Eighth Circuit held that the plaintiffs' common law claims for negligent inspection of rail cars, which derailed due to defective couplers, were preempted by the FRSA.  416 F.3d 787, 791-94 (8th Cir. 2005).  The court held that the FRSA's comprehensive regulations addressing freight car inspections substantially subsumed the subject matter of the claims.  *Id*. at 794-95.  In *Roth v. Norfalco LLC*, the Third Circuit held that negligence and strict liability claims against a shipper for tank car design were preempted under the HMTA.  651 F.3d 367, 376-79 (3rd Cir. 2011).  The court noted that HMTA regulations cover the "design" of a "package, container, or packaging component that is … qualified for use in transporting hazardous materials in commerce."  *Id*. at 376 (*quoting* 49 C.F.R. § 5125(b)(1)(E)).  The court agrees with the logic employed in *In re Derailment Cases* and *Roth* that Plaintiffs' claims related to the DOT-111 tanker cars are preempted under the HMTA and the FRSA.  For the foregoing reasons, Plaintiffs' negligence, gross negligence and negligence per se claims[6] related to the DOT-111 tanker cars, as well as common law strict liability claims[7] are **DISMISSED**.

---

[6] The court is cognizant that the FRSA does not preempt actions in which a party failed to comply with federal regulations.  49 U.S.C. § 20106(b)(1).  As discussed in this section, the allegations regarding deficient couplers point to a manufacturer and/or third-party inspector's potential lack of compliance, rather than NSRC's.
[7] Plaintiffs' strict liability claim is premised on the fact that NSRC was transporting "hazardous materials." (Compl. ¶ 29.)  Plainly read, this allegation relates to the inclusion of and/or defects in the DOT-111 tanker cars involved in the derailment.

## C. Operational Claims

Plaintiffs claim that NSRC failed to operate, maintain & control the train in a reasonable and safe manner,[8] including failure to warn about dangerous characteristics of the train and track. (Compl. ¶¶ 19, 22.)

### 1. Failure to Warn

Plaintiffs are not clear as to the manner in which NSRC is alleged to have failed in its duty to warn about the dangerous characteristics of the train and track. Specifically, Plaintiffs do not allege that NSRC failed to comply with federal statutes governing rail warning signs. As a result, the Court interprets Plaintiffs' claims as allegations that warnings in addition to those federally mandated, were required in this case. However, courts have consistently held failure to warn claims against railroads to be preempted by federal law. *See e.g. Springston v. Consolidated Rail Corp.*, 130 F.3d 241, 244 (6th Cir. 1997) (multiple federal statutes preempted state negligence claim against railroad for operating a "defective" train not equipped with warning devices "above and beyond those devices required by federal law"); *Easterwood*, 507 U.S. at 673 (negligence claims based on inadequate signalization preempted where federal funds were used to purchase the warning device and device conforms to federal requirements). Federal law contains comprehensive regulations governing railroad-highway grade crossing warnings (23 C.F.R. § 646.214), as well as reflective material and warning light requirements (49 C.F.R. §§ 224.101, 107). Federal regulations substantially subsume Plaintiffs' failure to warn claims such that preemptive effect applies.

---

[8] The Court's plain reading of this broad and vague allegation is that it relates to more specific allegations regarding the train speed, failure to warn, failure to mitigate or control the release of hazardous chemicals, and train crew qualifications.

14

### 2.  Train Speed Claims

It is well settled that the FRSA substantially covers the regulation of train speed. *Easterwood*, 507 U.S. at 673 (finding negligence claims related to train speed preempted by the FRSA's limitations for maximum train speeds, which take relevant conditions posed by track hazards into consideration); *Plymouth*, 283 F.3d 812 (holding that the "numerous federal regulations that cover the speed at which trains may travel" preempt state law claims).  Indeed, Plaintiffs even concede that train speed claims are preempted by federal law (Pl. Opp. Br., p. 60; ECF No. 107.).

As a result, Plaintiffs' negligence, gross negligence and negligence per se claims related to failure to warn and train speed are **DISMISSED**.

### D.  Track Inspection & Maintenance Claims

Defendants assert that Plaintiffs' negligent track inspection and maintenance claims are preempted by the FRSA and the ICCTA.   Plaintiffs allege that NSRC negligently failed to operate and maintain the track, including "failing to identify the fact that the curve of the track created a greater risk of derailment."  (Compl. ¶¶ 19, 22.)

The FRSA includes comprehensive regulations entitled "Track Safety Standards" codified at 49 C.F.R. § 213, *et. seq*.  Separate subparts promulgate the requirements for: (1) Track Geometry, including "the gage, alinement, and surface of track" (49 C.F.R. § 213.51, *et. seq.*); (2) Track Structure, including "ballast, crossties, track assembly fitting, and the physical condition of the rails," what constitutes a "defective rail" and other maintenance procedures (49 C.F.R. § 213.101, *et. seq*.); and (3) Inspection, including frequency and rigor of track inspection, recordkeeping and special inspections (49 C.F.R. § 213.231, *et. seq.*).  These regulations cover

the negligence claim at issue.  *See Nickels*, 560 F.3d at 432-33 (state negligence claim related to ballasts that provide support for track structure preempted by FRSA).

The statute itself is clear, however, that it "prescribes minimum safety requirements for railroad track" such that "a combination of track conditions, none of which individually amounts to a deviation from the requirements in this part, may require remedial action to provide for safe operations over that track."  49 C.F.R. § 213.1.  Read in conjunction with the FRSA's safety clause, federal law allows for more stringent state law track inspection and maintenance regulations where necessary to eliminate an essentially local safety hazard.  *See* 49 U.S.C. § 20106.  However, nothing in the evidentiary record suggests that a special local safety hazard existed in this case.

Plaintiffs' expert report states that the derailment was caused by a "broken rail resulting from a transverse defect in the 1981 rail that had been installed to this location... ." (Percy Rep., at V.3; ECF No. 107-43.)  According to the expert report, several tests conducted in September 2011 on rail at the same location revealed multiple transverse defects.  (*Id.* at III.8.5.)  NSRC subsequently installed the 1981 rail after the September 2011 testing.  (*Id.* at III.8.8.)  In April 2012, two additional transverse defects were discovered on the 1981 rail, while between April and July 11, 2012, five service failures on the rail were repaired.  (*Id.* at III.8.9-10.)  Plaintiffs allege that NSRC was "probably" negligent in failing to consider that "there may be underlying causes of the rail defects."  (*Id.* at V.5.)

Evidence – even expert evidence that may be admissible under *Daubert* standards – must consist of more than "an expert's bare opinion on the ultimate issue," in order to survive summary judgment.  *Hirsch v. CSX  Transportation Inc.*, 656 F.3d 359, 363 (6th Cir. 2011) (holding expert witness affidavit failed to produce evidence creating a genuine issue of material

fact on toxic-tort negligence claims following train crash); *see also Nye v. CSX Transportation, Inc.*, 437 F.3d 556, 565 (6th Cir. 2006) (finding expert witness affidavit and report insufficient to create genuine issue of material fact as to negligence claims related to adequate visibility of train cars resulting in crash).  Here, the Plaintiffs' expert report does not explain why testing on previous rail at the same location would indicate a local safety hazard, such that the applicable standard of rail maintenance would rise above federal mandates.  Plaintiffs do not allege that NSRC failed to comply with FRSA track inspection and maintenance regulations, rather, they contend that somehow the frequency and type of defects discovered (and subsequently repaired) by NSRC while performing track inspection demonstrate NSRC was negligent in not performing more stringent inspection and maintenance.  This does not rise to the level of evidence indicating a genuine dispute of material facts, particularly where, as here, if this frequency of defect was recognized by industry standards to require different rail, federal regulations could mandate so. *See Norfolk & W. Ry. V. Pub. Utils. Comm'n*, 926 F.2d 567, 571 (6th Cir. 1991) (the second savings clause "permits state regulation only where local situations are 'not capable of being adequately encompassed within uniform national standards'").

The Court also notes that the ICCTA preempts Plaintiffs' negligence claims to the extent that the state claim "intrude[s] upon the jurisdiction of the STB with regard to the regulation of rail transportation… ."  *R.R. Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523, 561 (6th Cir. 2002).  The STB has exclusive jurisdiction over "transportation by rail carriers" and "the construction, acquisition, operation, abandonment" of tracks or facilities. *Id.* at 563 (*quoting* 49 U.S.C. § 10501(b)).  For the reasons stated above, Plaintiffs' negligence, gross negligence, and negligence per se claims related to track inspection and maintenance are preempted by federal law and, therefore, **DISMISSED**.

### E.  Train Crew Qualification Claims

The FRSA prescribes "safety standards for the eligibility, training, testing certification and monitoring of all locomotive engineers to whom it applies."  49 C.F.R. § 240.1.  These regulations substantially subsume the hiring, training and supervision of persons operating a locomotive or train.  49 C.F.R. §§ 240.101-309; *see also Burlington Northern and Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 796 (7th Cir. 1999) (state laws regarding train crew qualifications preempted by federal law).  Furthermore, Plaintiffs do not address Defendants' motion to dismiss the train crew qualification claims in their memorandum in opposition.  Additionally, Plaintiffs' expert testified that he is not critical in any way of the train crew's actions at the time of the derailment.  Instead, his criticism of the train crew is limited to the speed at which the train was traveling.  (Percy Dep., pp. 29, 155; ECF No. 89.)  For these reasons, Plaintiffs' negligence, gross negligence and negligence per se claims related to qualification of the train crew are **DISMISSED**.

## V. SUFFICIENCY OF REMAINING CLAIMS

### A. Chemical Release & Remediation Claims

Plaintiffs assert that NSRC negligently failed to mitigate or control the release of hazardous chemicals and failed to exercise due care during the remediation and clean-up efforts.  (Compl. ¶¶ 19, 22.)  The elements of a negligence claim under Ohio law are: (1) duty; (2) breach; (3) causation; and (4) damages.  *Hirsch*, 656 F.3d at 362.  NSRC moves for summary judgment on the negligent chemical release and remediation claims for the following reasons.

### 1.  Lack of Pre-derailment Chemical Analysis

NSRC contends that Plaintiffs have shown no genuine issue of material fact that the derailment proximately caused Plaintiffs' alleged injuries.  Specifically, NSRC argues that the

lack of a baseline study determining the pre-derailment conditions of Plaintiffs' property is fatal to demonstrating that any chemicals later found on Plaintiffs' property are the proximate result of the derailment.

NSRC bases its argument on the Sixth Circuit's decision in *Hirsch v. CSX Transp. Inc.*, upholding summary judgment in favor of a defendant-railroad company on a claim for negligence related to a train crash allegedly exposing residents to a cancer-causing dioxin. 656 F.3d at 361. The court held that the plaintiffs failed to demonstrate a genuine issue of material fact with respect to their claims that a reasonable physician would order medical monitoring as a result of the dioxin exposure. *Id*. at 363-64. The court explained that evidence submitted by the plaintiffs' experts was too speculative to create a requisite factual issue. *Id*. Among other deficiencies, the court pointed out, the plaintiffs' causation expert stated that he could not rule out the possibility that factors other than the train crash caused raised dioxin levels in a residence occupied by two of the plaintiffs. *Id*. NSRC's reliance on *Hirsch*, however, fails to take into account the additional deficiencies relied on by the court. For example, the plaintiffs lacked medical evidence of the alleged increased risk in cancer caused by exposure to the dioxin in question, and the court found deficient multiple other expert witnesses relied upon by the plaintiffs. *Id*.

In this case, Plaintiffs' expert Gossman stated in his deposition that there is no way to scientifically establish the baseline levels of chemicals on Plaintiffs' property pre-derailment. (Gossman Dep., p. 87.) Nevertheless, Gossman asserts, it is clear that chemicals were added to Plaintiffs' property as a result of the derailment. (*Id*. at pp. 87-88; Gossman Rep., p. 7.) Both parties submit reports and testimony related to proximate causation, resulting in a classic litigation battle of experts. (*See Id*., Eckels Rep., p. 14, Nye Aff. ¶ 5; ECF No. 90-7, Ex. A; ECF

No. 90-8, Hunt Rep., pp. 12-15; ECF No. 90-14.)  Plaintiffs have, therefore, proffered sufficient evidence for a reasonable factfinder to find in their favor on proximate causation, despite the lack of a pre-derailment baseline analysis.

## 2.  Medical Injury

NSRC further contends that no genuine issue of material fact exists with respect to the derailment's proximate causation of Plaintiffs' alleged medical symptoms.  The court agrees. "In a toxic-tort case, as here, the plaintiff must establish both general and specific causation through proof that the toxic substance is capable of causing, and did cause, the plaintiff's alleged injury." *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 676-77 (6th Cir. 2011) (citing *In re Meridia Products Liability Litigation*, 328 F. Supp. 2d 791, 798 (N.D. Ohio 2004)) (affirming grant of summary judgment in favor of gas pipeline owner alleged to have negligently contaminated residents' property resulting in medical illness).  "Both causation inquiries involve scientific assessments that must be established through the testimony of a medical expert."  *Id.* at 677 (citing *Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 874 (S.D. Ohio 2010)).  "Without expert medical testimony on both general causation and specific causation, a plaintiff's toxic tort claim will fail." *Baker*, 680 F. Supp. 2d at 874.  Here, Plaintiffs have not submitted any expert medical testimony[9] and, as a result, claims pertaining to medical symptoms allegedly resulting from the derailment must fail.

## 3.  Interference with Property Use

NSRC contends Plaintiffs have failed to establish the derailment proximately caused interference of their property use.  Plaintiffs allege that, as a result of the derailment, their property is unsafe for employees to continue working on the facility site.  (Trimber Dep., at 135-

---

[9] None of Plaintiffs' experts is a medical or toxicology professional.  (Eckels Dep., p. 57; Gossman Dep., pp. 16-17; Percy Rep., at II.)

36.)  Plaintiffs assert damages in the form of lost business income, additionally incurred business expenses to move the facility, potential economic liability for chemical remediation of the property, and other costs.  (Trimbur Aff. ¶ 16; ECF No. 107-16; 107-38.)   NSRC asserts that Plaintiffs must demonstrate exposure and specific causation with respect to adverse health effects suffered by employees in order to satisfy proximate causation.  It is not so.  Plaintiffs need not satisfy the requisite test for toxic-tort medical injury in order to show a genuine issue of material fact on a negligent property damage claim.

Plaintiffs' environmental experts have submitted reports and testimony to the effect that it is unsafe for Plaintiffs to utilize their property.  (Gossman Rep., p. 8; Gossman Dep., pp. 31, 216; Eckels Rep., at 5.)  Plaintiffs have submitted expert and fact witness evidence into the record that the property is rendered unusable due to smell, sore throat, headaches, nausea and muscle aches. (Gossman Dep., p. 19; Eckels Rep., p. 9; Trimbur Dep., pp. 191-92.)   Plaintiffs have also testified that the value of their property has decreased.[10]  (Trimbur Dep., pp. 207-8.)  "Ohio law has long recognized that an owner of either real or personal property is, by virtue of such ownership, competent to testify as to the market value of the property."  *Smith v. Padgett*, 32 Ohio St.3d 344, 513 N.E.2s 737, 740 (Ohio 1987); *accord Rehkoph v. REMS, Inc.*, 40 F. App'x 126, 130 n.2 (6th Cir. 2002).  Plaintiffs have, therefore, presented evidence from which a reasonable factfinder could conclude that NSRC's negligence resulted in interference with Plaintiffs' property use.

For the reasons stated above, summary judgment on Plaintiffs' claim that NSRC negligently caused Plaintiffs' medical symptoms is **GRANTED** in favor of NSRC.  Summary

---

[10] NSRC has submitted an expert appraisal reflecting no loss in value of Plaintiffs' property after the derailment. While a finder of fact may credit this testimony, the record reflects a genuine issue of material fact, precluding summary judgment on this claim.

judgment in favor of NSRC on Plaintiffs' claim that NSRC's negligent mitigation and remediation efforts interfered with Plaintiffs' property usage is **DENIED**.

### B. Nuisance

NSRC moves for summary judgment on Plaintiffs' private nuisance claim. Private nuisance actions protect against "nontrespassory invasion of another's interest in the private use and enjoyment of land." *Brown v. Scioto Cnty. Bd. of Comm'rs,* 87 Ohio App.3d 704, 622 N.E.2d 1153, 1158 (Ohio Ct.App.1993). The Restatement (Second) of Torts § 822 defines the elements of a private nuisance as follows:

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
>
> (a) intentional and unreasonable, or
>
> (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

Restatement (Second) of Torts § 822 (1979).

### 1. Absolute Nuisance

Under Ohio law, "[a]n absolute nuisance, or nuisance per se, is that for which strict liability will attach. 'Absolute nuisance, for which strict liability or liability without fault is imposed by law, may be defined as a distinct civil wrong arising or resulting from the invasion of a legally protected interest, and consisting of an unreasonable interference with the use and enjoyment of the property of another.'" *Bracket v. Moler Raceway Park, L.L.C.*, 2011-Ohio-4469, ¶ 16, 195 Ohio App.3d 372, 375, 960 N.E.2d 484, 487 (*quoting Taylor v. Cincinnati* (1944), 143 Ohio St. 426, 28 O.O. 369, 55 N.E.2d 724)). "While the law in Ohio is far from clear in this area, absolute nuisance and nuisance *per se* seem to be the same. The essence of

these two characterizations of nuisance is that no matter how careful one is, such activities are inherently injurious and cannot be conducted without damaging someone else's property or rights." *Brown,* 622 N.E.2d at 1159.

Plaintiffs have produced no evidence that NSRC intentionally or unreasonably invaded Plaintiffs' property such that liability without fault should attach. *See Bracket*, 195 Ohio App.3d at 375. The act of operating the railroad in compliance with federal and state regulations is not "inherently injurious" to the extent that it "cannot be conducted without damaging someone else's property or rights." *See Brown*, 622 N.E.2d at 1159. Similarly, the mitigation and remediation efforts by NSRC are not so inherently injurious and are not alleged to have been conducted without permission. Summary judgment in favor of NSRC on Plaintiffs' absolute nuisance claim is, therefore, **GRANTED**.

### 2.  **Qualified Nuisance**

"In contrast, 'qualified' nuisance is premised upon negligence. A qualified nuisance is defined as essentially a tort of negligent maintenance of a condition that creates an unreasonable risk of harm." *Peters v. Angel's Path, L.L.C.*, 2007-Ohio-7103, ¶ 31 (*citing State ex rel. R.T.G., Inc. v. State*, 98 Ohio St.3d 1, 2002-Ohio-6716 ¶ 59). "To recover damages for a qualified nuisance, negligence must be averred and proven." *Id* (*citing Brown,* 622 N.E.2d at 713-15; *Allen Freight Lines, Inc. v. Consol. Rail Corp.* (1992), 64 Ohio St.3d 274, 276 (Ohio 1992)). As a result, Ohio courts have held that actions for qualified nuisance and negligence merge. *See, e.g., Allen Freight,* 595 N.E.2d at 856; *Hardin v. Naughton,* 2013–Ohio–1549, at ¶ 20 (Ct.App.). The Plaintiffs' qualified nuisance claim and surviving negligence claims are, therefore, one and the same and may move forward under one name.

### C. Trespass

Finally,[11] NSRC claims that Plaintiffs have failed to establish a genuine issue of material fact with respect to their claim for trespass.

To state a cause of action in trespass, a property owner must prove two essential elements: (1) an unauthorized intentional act; and (2) an intrusion that interferes with the owner's right of exclusive possession of her property. *Weir v. E. Ohio Gas Co.*, 2003-Ohio-1229, ¶ 16. NSRC's reliance on *Brown* as supportive here is misplaced. In *Brown*, the Ohio Court of Appeals clarified that trespass requires "some substance [to have] entered upon the land itself, affecting its nature and character, and causing substantial actual damage to the res." 622 N.E.2d at 1161-62. While noxious odors or diminution of value do not amount to trespass, Plaintiffs' here adduced some evidence that, as a result of the derailment, harmful grains, dioxins and/or other chemicals have entered their property, thereby precluding summary judgment on this claim. *See Sanson Co. v. Granger Materials, Inc.*, 2007-Ohio-5852 ¶ 5, 2007 WL 3203015. NSRC's motion for summary judgment on Plaintiffs' trespass claim is **DENIED**.

### VI. CONCLUSION

For the reasons stated above, Defendants' Motion to Strike (ECF No. 117) is **DENIED as MOOT**. Defendants' Motion for Partial Summary Judgment (ECF No. 106) is **GRANTED** and Defendants' Motion for Summary Judgment (ECF No. 90) is **GRANTED in PART and DENIED in PART**. Specifically, summary judgment is:

- **GRANTED** as to the negligence, gross negligence and negligence per se claims related to the acceptance and condition of the DOT-111 tanker cars;

---

[11] NSRC also moves to dismiss Plaintiffs' claims for attorney's fees and punitive damages. As a matter of policy, the Court generally bifurcates punitive damage and attorney's fee claims from resolution until the underlying claims in the action have been resolved.

- **GRANTED** as to the negligence, gross negligence and negligence per se claims related to failure to warn, train speed, track inspection and maintenance, and train crew qualifications;

- **GRANTED** as to the strict liability claim;

- **DENIED** as to the claims that NSRC negligently failed to control, mitigate and remediate the release of hazardous materials;

- **GRANTED** as to the claims that the derailment proximately caused personal injury;

- **GRANTED** as to the private absolute nuisance claim;

- **DENIED** as to the private qualified nuisance claim, which **MERGES** with the remaining negligence claims;

- **DENIED** as to the trespass claims;

- **DENIED** in all other respects.

**IT IS SO ORDERED.**

_8-10-2015_

**DATE**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT CHIEF JUDGE**